## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DOUGLAS W. BREWER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 11-CV-295-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>OPINION AND ORDER</u>

Claimant, Douglas W. Brewer ("Brewer"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Brewer appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Brewer was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Brewer was 52 years old at the time of the hearing before the ALJ on February 5, 2009. (R. 27).  At the hearing, Brewer amended the onset date of his disability to September 14, 2006. (R. 25-26).  Brewer had an eighth grade education, and he obtained a GED.  (R. 29).  Brewer had a certificate in heat and air.  (R. 30).

Brewer testified that he last worked in 2002 or 2003 at a mini storage facility, and he was fired.  (R. 31).  His employer said that he was fired because he could not perform his job and keep up with what the employer wanted him to do.  *Id.*  He had previously worked as a delivery driver and as a maintenance employee for an apartment complex.  (R. 33).

When asked to list all of the reasons why he could not work, Brewer listed panic, anxiety, depression, headaches, arthritis, and pain in his neck, back, shoulders, and knees.  (R. 34).  He also said that his arthritis limited his ability to move, such as when his hands would occasionally "freeze up."  *Id.*  Brewer testified that he experienced headaches approximately every other day, and they lasted for about two to three hours.  (R. 35).  He had not discussed these headaches with his physicians, because he had only been experiencing the headaches for about a year.  *Id.*

Brewer said his main shoulder problem was with his left shoulder.  (R. 35-36).  He had been having problems with it for decades, but he was unsure of the exact diagnosis.  (R. 36).  He had received cortisone shots in his shoulder.  (R. 36-37).  Brewer said that he had a "stiff" neck, and his physicians had told him that he did not have the natural curve in his spine that a neck should have.  (R. 37-38).  He had difficulty turning his head from side to side or up and down "at times."  (R. 38).  These episodes involving his neck would sometimes last for a few days or a week, and he used heating pads to get relief.  (R. 38-39).

Brewer said that the main problem with his hands was that his knuckles hurt, but one day he woke up, and his hands were frozen in one position.  (R. 39).  His physician had said the problems were due to arthritis.  *Id.*  Brewer testified that he could pick up small items, such as poker chips, from a table without difficulty.  *Id.*

Brewer testified that he had high blood pressure that was not completely controlled by medication.  (R. 40).  He agreed that he did not have any organ damage, but he said he had been told not to do strenuous exercise.  (R. 40-41).  He could engage in mild exercise.  *Id.*

Brewer said that his low back hurt all the time.  (R. 41).  He had previously had two disks removed.  *Id.*  He did not wear a brace, and he had previously used a TENS unit, but he did not use it because it had quit helping the pain.  (R. 41-42).  He was able to bend over and touch his knees.  (R. 42).  He could not touch his toes.  *Id.*  He could not squat and return to a standing position, because his knees would have intense pain.  *Id.*  Walking up and down stairs was difficult, and if he had to do it a few times, he would experience swelling.  *Id.*

Brewer had a driver's license with no restrictions.  (R. 42-43).  He estimated that he only drove a quarter of a mile in an average week.  (R. 43).  He did not have any physical problems driving a car.  (R. 43-44).

Brewer said he was affected by weather that would sometimes increase his depression or anxiety.  (R. 44).

Brewer experienced pain in his knees if he remained in a sitting position "for a while," and he said that his knees hurt when he woke up.  (R. 45).  He said that his doctor had told him he had inflammation from bones in his knees rubbing against each other, and the doctor recommended that he avoid climbing stairs or ladders.  *Id.*

Brewer's depression caused him to cry and to feel sad all the time.  *Id.*  There were days when his depression was worse.  (R. 55-56).  He didn't like having a lot of people around, and on days when his depression was worse, he didn't even want to be around his wife.  (R. 46, 56).  When asked if he could go into a grocery store on a busy day and get what he needed without any problems, Brewer said no.  (R. 46).  He had trouble with concentration, and he could not focus on a two-hour movie.  (R. 57).  If someone gave him instructions, he would have trouble repeating them an hour later.  *Id.*

Brewer said that he had been diagnosed with panic attacks and anxiety issues after he had experienced shortness of breath and cardiac issues were ruled out.  (R. 51-52).  He did not get another job after his last job because he would feel intense anxiety and panic when he made any attempt to do so.  (R. 53).  His panic attacks had intensified over time.  *Id.*  Because he stayed in his house now and avoided situations that caused him stress, he experienced approximately three or four panic attacks a week.  (R. 54).  The panic attacks could last for fifteen minutes or for an entire day.  *Id.*

The only side effect to his medications was drowsiness.  (R. 46).  In addition to his medications, he tried to alleviate his symptoms by stretching and by doing aerobics until the pain was too intense.  *Id.*

Brewer testified that he did no household chores, such as doing the dishes, dusting, sweeping, mopping, vacuuming, making the bed, doing laundry, cooking, or shopping.  (R. 47). He testified that he would think about doing something, but then he would get confused in thinking about it, and he would end up with nothing done.  (R. 55).  His wife paid the bills, and he wasn't sure he could cope without her.  *Id.*  He did not do any yard work.  (R. 48).  He watched television, and he read.  (R. 47).  He had one friend who would visit him perhaps once a month, and he had a brother he talked to occasionally over the phone.  (R. 48).  He did not participate in any social activities.  *Id.*  He didn't eat as much as he previously had, and he had experienced a 35 pound weight loss in the previous year.  *Id.*  He had difficulty going to sleep and staying asleep.  (R. 49).  He estimated that he slept about six hours on an average night.  (R. 49-50).  He slept some during the day, but he described it more as lying down to relax.  (R. 50). He did more lying down when his depression was worse.  (R. 55-56).

Brewer estimated that he could sit or stand for about one-half hour at one time.  (R. 50). He thought he could walk one-quarter mile.  *Id.*  He said that one doctor said that he could never lift over 20 pounds due to his disk situation.  (R. 51).

The administrative transcript includes seven pages of progress notes from David Crass, M.D. dated 2003 through 2007.  (R. 194-200).  There is also a Mental Status Form apparently signed by Dr. Crass dated June 19, 2007, that has no comments except a hand-written note to "see progress notes."  (R. 193).  The form indicates that Dr. Crass believed that Brewer was capable of handling his own funds.  *Id.*  A medication sheet indicates that Dr. Crass prescribed medications such as Xanax, trazodone, Lortab, Viagra, and Cialis.  (R. 194).  The hand-written progress notes are virtually illegible.  (R. 195-200).

Brewer was seen by Bradford L. Boone, M.D. with Eastern Oklahoma Orthopedic Center, Inc. on November 3, 2005 for pain and swelling in both knees.  (R. 265).  Dr. Boone recounted that Brewer's knees bothered him "primarily with squatting and kneeling" activities.  *Id.*  The problem had been aggravated by significant stair climbing two weeks before the evaluation, and it had mostly resolved.  *Id.*  On examination, Dr. Boone found normal alignment, full motion, moderate patellofemoral crepitus bilaterally with some tenderness along the medial patellar facet, no joint line tenderness, negative McMurray's, and ligamentously stable knees.  *Id.*  He also said that patellofemoral tracking was congruous.  *Id.*  He said that x-rays showed mild degenerative changes.  *Id.*  His impression was bilateral patellofemoral compression syndrome, and he recommended exercises and conservative treatment.  *Id.*

Brewer saw Christopher V. Moses, D.O. on August 25, 2008, with complaints of panic attacks, low back pain rated as 5 on a scale of 1 to 10, bilateral knee pain rated as 5-6, and anxiety.  (R. 275).  Dr. Moses checked boxes on the form indicating that he found musculoskeletal and neurological abnormalities, but the hand-written comments are not legible.  *Id.*  Dr. Moses prescribed Xanax and Lortab.  *Id.*  Dr. Moses saw Brewer monthly through December 2010 for essentially the same complaints, and he continued Brewer's prescriptions of Xanax and Lortab.  (R. 272-74, 281-88).  Dr. Moses began prescribing Elavil in May 2010, and continued that prescription until December 2010 as well.  (R. 285-88).

Brewer saw Beatrice E. Gorgas-Butler, Ed.D., H.S.P. for an initial session on November 16, 2010.  (R. 302).  Gorgas-Butler indicated that Brewer's diagnoses were major depressive disorder, recurrent, and panic disorder with agoraphobia.  *Id.*  She scored his Global Assessment

of Functioning ("GAF")[1] as 35-40.  *Id.*  She added a note to this record dated December 16, 2010

that she believed Brewer was unable to work in any capacity due to the severity of his symptoms

and his very low threshold for stress.  *Id.*  Also on November 16, 2010, Gorgas-Butler completed

a Mental Status Evaluation Checklist form.  (R. 276-77).  She stated that Brewer had significant

psychomotor retardation.  (R. 276).  She described him as distractible and said that his

concentration was scattered and affected by anxiety.  *Id.*  She circled that his recent and remote

memory was defective.  *Id.*  She indicated that he was preoccupied with death, and his thought

content was loosely organized.  (R. 277).  She indicated that he had poor judgment, distorted

reality testing, and confused and paralyzed decision making.  *Id.*  Brewer had deficits in coping

skills, communication, and activities of daily living.  *Id.*

Brewer saw Gorgas-Butler for sessions on December 2, 8, and 14, 2010.  (R. 303-04).

Gorgas-Butler wrote a "To Whom It May Concern" letter dated December 9, 2010 stating that

Brewer was very severely depressed and met the criteria for panic disorder with agoraphobia.  (R.

301).  She stated her opinion that Brewer was unable to work in any capacity.  *Id.*

---

[1] The GAF score represents Axis V of the multiaxial assessment system.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-36 (Text Revision 4th ed. 2000).   A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*.   A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

Agency consultant Ashok Kache, M.D. performed a physical examination of Brewer on August 30, 2007. (R. 207-12). On examination, Dr. Kache found no swelling of Brewer's extremities, although he noted that Brewer said he had swelling intermittent if he drove for long periods of time. (R. 208). Brewer had moderate limitations of range of motion of his lumbar spine, and he had difficulty with toe-and-heel walking. *Id.* Brewer had some difficulty picking up small objects. *Id.* Dr. Kache's impressions were anxiety / panic attack, hypertension, and post lumbar surgery / chronic back pain syndrome. *Id.* Dr. Kache noted pain and limited range of motion related to Brewer's lumbosacral spine on an additional backsheet. (R. 212).

Agency nonexamining consultant Thurma Fiegel, M.D., filled out a Physical Residual Functional Capacity Assessment May 16, 2006. (R. 231-38). Dr. Fiegel found that Brewer had the exertional capacity to perform light work. (R. 232). In the space for narrative explanation, Dr. Fiegel briefly summarized Dr. Kache's report. *Id.* For postural limitations, Dr. Fiegel found that Brewer would be occasionally limited in his ability to stoop. (R. 233). She found Brewer had no other physical limitations. (R. 233-37).

Agency consultant Jeri Fritz, Ph.D. conducted an examination of Brewer on August 29, 2007. (R. 267-69). Dr. Fritz observed that Brewer had a flat affect, but he was able to follow oral and written directions. (R. 269). On examination, Brewer's immediate recall and long-term memory appeared to be within normal limits, but his short-term memory appeared to be impaired. *Id.* His attention and concentration appeared intact. *Id.* His test scores indicated that he had poor problem solving skills and judgment. *Id.* His insight was limited. *Id.* Dr. Fritz believed that Brewer would be able to perform simple, repetitive tasks. *Id.* His ability to relate to others, including co-workers and supervisors was estimated to be fair. *Id.* His ability to handle the stress of day to day interactions was judged to be poor. *Id.* Dr. Fritz believed that

8

Brewer avoided all situations that might result in a negative experience, and she said that his prognosis was guarded. *Id.* She believed that he was capable of handling his funds. *Id.* Her Axis I[2] diagnoses were dysthymic disorder and panic disorder without agoraphobia, and she evaluated Brewer's GAF as 50. *Id.*

Cynthia Kampschaefer, Psy. D., an agency nonexamining consultant, completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment on September 24, 2007. (R. 213-30). For Listing 12.04, Dr. Kampschaefer noted Brewer's depressive syndrome, dysthymic disorder, and panic disorder. (R. 216). She also noted Brewer's anxiety and panic disorder for Listing 12.06. (R. 218). For the "Paragraph B Criteria,"[3] Dr. Kampschaefer found that Brewer had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with one or two episodes of decompensation. (R. 223). In the Consultant's Notes portion of the form, Dr. Kampschaefer summarized Dr. Fritz' consultive examination. (R. 225).

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

[3] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

In her Mental Residual Functional Capacity Assessment, Dr. Kampschaefer found that Brewer was markedly limited in his ability to understand, remember, and carry out detailed instructions.  (R. 227).  She found Brewer to be markedly limited in his ability to interact appropriately with the general public.  (R. 228).  She found no other significant limitations.  (R. 227-28).  Dr. Kampschaefer stated that Brewer could perform simple tasks with routine supervision, could relate to supervisors and peers on a superficial work basis, and could adapt to a work situation.  (R. 229).  She stated that Brewer could not relate to the general public.  *Id.*

Agency nonexamining consultant Janice B. Smith, Ph.D. completed a second Psychiatric Review Technique form and a second Mental Residual Functional Capacity Assessment on December 17, 2007.  (R. 239-56).  For Listing 12.04, Dr. Smith noted Brewer's depressive syndrome, and she noted panic disorder without agoraphobia for Listing 12.06.  (R. 242, 244).  For the Paragraph B Criteria, Dr. Smith found that Brewer had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with insufficient evidence of episodes of decompensation.  (R. 249).  In the Consultant's Notes portion of the form, Dr. Smith summarized Brewer's claims at the reconsideration level and Dr. Fritz' consultive examination.  (R. 251).  Dr. Smith concluded that Brewer appeared to be able to do simple work without public contact.  *Id.*

In her Mental Residual Functional Capacity Assessment, Dr. Smith found, as did Dr. Kampschaefer, that Brewer was markedly limited in his ability to understand, remember, and carry out detailed instructions and in his ability to interact appropriately with the general public.  (R. 253-54).  Dr. Smith stated that Brewer could understand, remember, and carry out simple, but not detailed, tasks that do not require strong short-term memory skills.  (R. 255).  She found that he could not relate effectively to the general public, but he could relate superficially to co-

workers and supervisors.  *Id.*  She found that Brewer could work under routine supervision, could adapt to a work setting, and could complete a normal work day and work week from a mental standpoints.  *Id.*

## Procedural History

Brewer filed an application on June 27, 2007 seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq*.  (R. 118-19).  Brewer alleged onset of disability as October 1, 2003.  (R. 118).  The application was denied initially and on reconsideration.  (R. 79-83, 85-87).  A hearing before ALJ Gene M. Kelly, was held February 5, 2009 in Tulsa, Oklahoma.  (R. 19-73).  By decision dated June 11, 2009, the ALJ found that Brewer was not disabled.  (R. 8-18).  On March 22, 2011, the Appeals Council denied review of the ALJ's findings.  (R. 1-3).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[4]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'"  *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

### Decision of the Administrative Law Judge

The ALJ found that Brewer met insured status through December 31, 2007.  (R. 10).  At

Step One, the ALJ found that Brewer had not engaged in any substantial gainful activity since his

amended alleged onset date of September 14, 2006.  *Id*.  At Step Two, the ALJ found that Brewer

had severe impairments of depression, anxiety, panic attacks, headaches, and problems with his

back, knee, legs, hands, neck, and shoulder.  *Id.*  At Step Three, the ALJ found that Brewer's

impairments did not meet a Listing.  (R. 11-13).

The ALJ determined that Brewer had the RFC to perform light work except:

limited climbing and squatting; occasional bending, stooping, crouching,
crawling, kneeling, push/pull with left arm; reach overhead with left arm;
occasional twisting and nodding of the head; and slight limitation in fingering,
feeling, and gripping.  In addition, he would need low light environment.
Mentally, the work would need to be simple, repetitive, and routine and limited
contact with the public, co-workers, and supervisors.

(R. 13).  At Step Four, the ALJ found that Brewer was unable to perform any past relevant work.

(R. 17).  At Step Five, the ALJ found that there were jobs in significant numbers in the national

economy that Brewer could have performed until his date last insured, taking into account his

age, education, work experience, and RFC.  (R. 17-18).  Therefore, the ALJ found that Brewer

was not disabled at any time from October 1, 2003 through December 31, 2007, the date last

insured.  (R. 18).

### Review

Brewer makes four arguments that the ALJ's decision should be reversed.  First, he faults

the ALJ's Step Three findings for several reasons.  Second, Brewer argues that the ALJ did not

propound a proper hypothetical to the vocational expert (the "VE").  Third, Brewer faults the

ALJ's credibility assessment.  Fourth, Brewer states that the Commissioner failed to furnish a

complete transcript.  Regarding the issues raised by Brewer, the undersigned finds that the ALJ's

decision is supported by substantial evidence and complies with legal requirements.  Therefore, the ALJ's decision is affirmed.

Before discussing the merits of Brewer's appeal, the Court notes the requirements of a claimant in articulating his arguments before this Court.  These requirements were discussed by the majority in the Tenth Circuit case of *Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009).  In *Wall*, the court discussed an argument related to the claimant's RFC.  *Id.*  The Tenth Circuit noted that at the district court level, the claimant had merely alleged, several times, that the ALJ had failed to consider the objective medical evidence.  *Id.*  The appellate court cited to the opinion of the district court judge, stating that "[b]ecause Claimant's counsel failed to present any developed argumentation in regard to Claimant's physical impairments, the district court obviously viewed this issue as waived."  *Id.*  The Tenth Circuit called the claimant's argument at the district court "perfunctory," and said that it had deprived that court of the opportunity to analyze and rule on that issue.  *Id.*  (quotation and citation omitted).  *See also Krauser v. Astrue*, 638 F.3d 1324, 1326 (10th Cir. 2011) (Tenth Circuit's review is limited to issues the claimant preserved at the district court level and adequately presented on appeal); *Reveteriano v. Astrue*, 2012 WL 3055799 (10th Cir.) (unpublished) (same).

**Step Three Issues**

Brewer first argues that he met Listing 12.04C, but this argument is extremely truncated in that it simply asserts that he met a quoted provision of this Listing.  Plaintiff's Opening Brief, Dkt. #22, p. 2.  The Court is doubtful that this argument is one that is sufficiently developed, pursuant to the standards articulated by the Tenth Circuit in *Wall* as discussed above, to allow the Court to meaningfully analyze it.  The Court can ascertain that Brewer is making his assertion regarding Listing 12.04C based on the Psychiatric Review Technique form completed by Dr.

Kampschaefer.  (R. 224).  Brewer fails, however, to actually discuss Dr. Kampschaefer's findings in that form and in the accompanying Mental Residual Functional Capacity Assessment form.

If the Court were to find that this argument was sufficiently developed and therefore not waived by Brewer, it would still not be persuasive.  On the critical page Dr. Kampschaefer did, indeed, check boxes indicating that Brewer fulfilled the requirements of Paragraph C by having repeated episodes of decompensation, each of extended duration, and by having a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.  (R. 224).  Directly below these provisions on the form, however, Dr. Kampschaefer also checked the box stating that "[e]vidence does not establish the presence of the 'C' criteria."  *Id.*  There are several indications that Dr. Kampschaefer intended to communicate that the Paragraph C criteria were not established, and that the checkmarks to the contrary were the equivalent of a "scrivener's error."  First, Dr. Kampschaefer completed a Mental Residual Functional Capacity Assessment.  If she truly found that Brewer met the requirements of a Listing, any further analysis regarding his functional capacity would not be needed.  *Williams*, 844 F.2d at 750 (if a determination can be made at any of the steps that a claimant is disabled, evaluation under a subsequent step is not necessary).  Second, on the Mental Residual Functional Capacity Assessment, Dr. Kampschaefer found only three functional areas had marked limitations, and she then included narrative comments that Brewer could perform simple tasks with routine supervision and could adapt to a work situation.  (R. 227-29).  These findings are wholly contradictory to a finding that Brewer was conclusively disabled because he met a Listing.  It is therefore reasonable to conclude that Dr. Kampschaefer's checkmarks on the Psychiatric Review Technique form were not intended to communicate that she believed Brewer was disabled because he met the criteria of Listing 12.04C.

In Brewer's Reply Brief, he argues that the ALJ ignored the inconsistency of Dr. Kampschaefer's form and that the ALJ should have resolved it.  Plaintiff's Reply Brief, Dkt. #24, p. 1.  Brewer also claims that all other arguments are impermissible *post hoc* arguments that the ALJ did not make.  *Id.*  The undersigned finds Brewer's arguments in his Reply Brief to be unpersuasive.  First, the Tenth Circuit has rejected a similar argument regarding the ALJ's need to discuss inconsistencies between his Paragraph B findings and those of agency consultants.  *See Barber v. Astrue*, 431 Fed. Appx. 709, 712 (10th Cir. 2011) (unpublished).  In *Barber*, the court found that the ALJ was not required to explain differences in severity ratings when his ultimate RFC assessment was consistent with consultant's opinion.  Here, the ALJ's ultimate RFC determination was consistent with the opinions of Drs. Kampschaefer and Smith as reflected in the Mental Residual Functional Capacity Assessment forms, and therefore no further explanation regarding the differences in the Psychiatric Review Technique form was necessary.

The undersigned is mindful that the Court may not "create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself."  *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007).  However, here, the undersigned's explanation for why it was not reversible error for the ALJ to fail to discuss the Listing 12.04C checkmarks of Dr. Kampschaefer is not a violation of the rule against *post hoc* justifications.  In another case, the Tenth Circuit rejected an argument that the Commissioner engaged in *post hoc* justification of the ALJ's decision when the issue raised by the claimant was

that the ALJ had failed to discuss her cardiac problems:

> We have simply reviewed the record in order to determine whether, and then to illustrate why, the ALJ's omissions were not legal error. The ALJ was not required to provide grounds in the decision for failing to do what was not required. Thus, neither we nor the Commissioner have relied on a substitute rationale for upholding the ALJ's decision.

*Big Pond v. Astrue*, 280 Fed. Appx. 716, 719 n.2 (10th Cir. 2008) (unpublished).

Finally, it is evident to the undersigned that this case comes directly within the decision of the Tenth Circuit in *Fischer-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2005). In *Fischer-Ross*, the ALJ had failed to include any facts or analysis in Step Three, but had only included the statement that "a review of the medical evidence fails to reveal the existence of an impairment or combination of impairments which specifically meets or equals the criteria" of any listing. *Fischer-Ross*, 431 F.3d at 731-32. The district court held that this was reversible error because the court could not adequately review the bare conclusion. The district court went on, however, to uphold the ALJ's determination at Steps Four and Five that the claimant's RFC allowed her to perform a significant number of occupations. *Id.* at 732. The district court remanded so that the ALJ could provide a "sufficiently explicit rejection of Claimant's disability claim at step three," and that in that case, the ALJ's conclusion would be affirmed because the district court had already found that the ALJ's analysis at Steps Four and Five was supported by substantial evidence. *Id.* at 732-33.

On appeal to the Tenth Circuit, the claimant in *Fischer-Ross* did not address the substance of the Commissioner's argument that the ALJ's evaluation and specific findings at Steps Four and Five precluded a favorable ruling at Step Three, and instead argued that remand was required because the ALJ's Step Three discussion was "insufficiently detailed." The Tenth Circuit rejected this *per se* rule, saying that it would lead "to purely formalistic remands

unjustifiably prolonging administrative proceedings." *Fischer-Ross*, 431 F.3d at 733.  Instead,

the court agreed that:

> an ALJ's findings at other steps of the sequential process may provide a proper
> basis for upholding a step three conclusion that a claimant's impairments do not
> meet or equal any listed impairment.

*Id.*  The court then turned to whether the ALJ's findings at Steps Four and Five justified his Step

Three conclusions, and found that the ALJ's specific findings at those steps contradicted a

conclusion that the claimant's problems could meet the severity required to be conclusively

presumed disabled under any of the pertinent listings.  *Id.* at 734-35.  The court therefore

reversed the district court and affirmed the ALJ's administrative determination.  *Id.* at 735.

Here the ALJ made an RFC determination and an analysis at Step Five that are supported

by substantial evidence and that are free from reversible error, as discussed below.  Because the

ALJ's analysis at Step Five is adequate, there is no possibility that a reasonable fact finder could

find that Brewer's mental condition met the severity level required by Listing 12.04C.  The

ALJ's failure to discuss the forms of Dr. Kampschaefer in relationship to Listing 12.04C at Step

Three was not reversible error.

Brewer also argues that the ALJ erred by failing to find that he met Listing 1.04A for

disorders of the spine, and he cites to various part of the records to support this argument.

Plaintiff's Opening Brief, Dkt. #22, p. 2.  One of the central records relied upon by Brewer is the

initial examination done by Dr. Moses on August 25, 2008, which the Commissioner points out

was after Brewer's insured status expired on December 31, 2007.  (R. 275).  The more

fundamental point, however, is that the record of Dr. Moses' examination does not appear to

support the establishment of the required conditions of Listing 1.04A.  Brewer says this page of

the record establishes, first, that he had nerve root compression characterized by neuro-anatomic

distribution of pain, and second, that his limitation of motion of the spine and motor loss with muscle weakness was accompanied by reflex loss.  Plaintiff's Opening Brief, Dkt. #22, p. 2.  Dr. Moses' hand-written notes are difficult to read, and while there appears to be one note of decreased reflexes, this record simple does not support either nerve root compression or a neuro-anatomic distribution of pain.  (R. 275).

The ALJ was therefore not required, at Step Three, to discuss a one-page medical record that was made several months outside the relevant period and that did not clearly establish some of the required conditions of Listing 1.04A.  The ALJ's Step Three was sufficiently detailed and was supported by substantial evidence.

**Hypothetical to the VE**

At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account his age, education, work experience and RFC.  *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999).  The ALJ is allowed to do this through the testimony of a VE.  *Id.* at 1089.

While Brewer casts this section of his brief as an argument that the ALJ failed to propound a proper hypothetical to the VE, the undersigned has difficulty deciphering Brewer's exact argument.  Plaintiff's Opening Brief, Dkt. #22, p. 3.  It appears that the import of the argument is that Brewer believes that his RFC would not allow him to perform the job of electrical assembler, performed at the light exertional level, because it requires frequent reaching. *Id.*  The hitch in Brewer's argument is that the ALJ never found that Brewer was incapable of frequent reaching.  Instead, his RFC and his hypothetical to the VE included more narrowly defined limitations:  occasional push/pull with the left arm and occasional reaching overhead with the left arm.  (R. 13, 61-66).  The VE identified the job of electrical assembler as one

capable of being performed by an individual with those limitations. *Id.* The VE testified that her testimony was consistent with the Dictionary of Occupational Titles (the "DOT"). *Id.* The ALJ then relied on that testimony by the VE in deciding at Step Five that there were jobs in significant numbers that Brewer could perform with the RFC determined by the ALJ. (R. 17-18). While Brewer asks this Court to determine that in reality a person with his RFC could not perform the job because the DOT says it requires frequent reaching, that would put the Court in the place of overruling the testimony of the VE and being a fact-finder in the first instance. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"); *Allen v. Barnhart,* 357 F.3d 1140, 1143-45 (10th Cir. 2004) (court acts within confines of its administrative review authority). The Court declines Brewer's invitation to exceed the statutory confines of this review.

The undersigned finds no error at Step Five of the ALJ's decision.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

In his decision, the ALJ gave several reasons[5] for finding Brewer's testimony to be less

than fully credible.  (R. 16).  The ALJ first noted Brewer's testimony that he had experienced

headaches for about one year, but had not mentioned them to his physicians.  *Id.*  He found

Brewer's behavior to be curious, and he believed that if the headaches were part of what was

disabling, Brewer would have sought relief.  *Id.*  The extensiveness of the claimant's efforts to

obtain relief is a legitimate specific reason for a finding of credibility.  *Kepler*, 68 F.3d at 391.

The ALJ also contrasted Brewer's testimony regarding his hands "freezing up" with the

medical records, finding that there was no mention of this problem to Dr. Moses.  (R. 16).

Contrast between the claims of the claimant and the medical evidence of record is another

legitimate reason for an ALJ to use in a credibility assessment.  *See* 20 C.F.R. § 404.1529(c)(4)

("we will evaluate your statements in relation to the objective medical evidence").  Brewer is

correct that the ALJ's statement that Brewer's hands were "fine" at the consultative examination

with Dr. Kache was not accurate because Dr. Kache observed that Brewer had difficulty picking

up small objects.  (R. 16, 208).  This minor inaccuracy does not affect the validity of his

credibility assessment.  *Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993) ("minor error" did

not "undermine confidence" in the ALJ's decision); *Talamantes v. Astrue,* 370 Fed. Appx. 955,

959 (10th Cir. 2010) (unpublished); *Ramsey v. Barnhart*, 117 Fed. Appx. 638, 640 (10th Cir.

---

[5] Brewer faults the introductory language used by the ALJ: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." While this language might have been "meaningless boilerplate," it was merely an introduction to the ALJ's analysis and was not harmful.  *See Kruse v. Astrue*, 2011 WL 3648131 at *6 (10th Cir.) (unpublished) ("boilerplate language is insufficient to support a credibility determination only in the absence of a more thorough analysis").

2004) (unpublished); *Whitney v. Barnhart*, 60 Fed. Appx. 266, 268 n.1 (10th Cir. 2003). (unpublished).

The ALJ also noted the testimony of Brewer when he said that he was able to change a light bulb, which tended to undermine his claim that his shoulder issues contributed to his inability to work.  (R. 16).  The ALJ found that Brewer's statement that he could do mild aerobic activity also undermined his claim of total disability.  *Id.*

The ALJ found it significant that, while Brewer testified that he had neck problems, the ALJ could not find any reference to those problems in the records of Dr. Moses.  *Id.*  Finally, the ALJ found that Brewer had made inconsistent statements regarding his ability to sleep.  *Id.* These are all legitimate reasons for a finding of limited credibility, and they are affirmatively linked to substantial evidence.

In attempting to combat the ALJ's credibility assessment, Brewer first complains of multiple factual errors by the ALJ throughout the decision.  Plaintiff's Opening Brief, Dkt. #22, pp. 5-6.  One example is that the ALJ stated that Brewer said he could go into a store on a busy day without problems.  (R. 12).  The transcript, presumably prepared after the ALJ entered his decision, reflects that Brewer testified that he could not successfully enter a store on a busy day. (R. 46).  These minor errors were not directly related to the ALJ's credibility assessment, and they do not undermine that assessment.  *Gay*, 986 F.2d at 1341.

Another inapplicable discussion was Brewer's extended discourse regarding activities of daily living.  Plaintiff's Opening Brief, Dkt. #22, pp. 6-7.  Activities of daily living were discussed by the ALJ in relationship to the Paragraph B Criteria, but they were not a basis for his credibility assessment.  (R. 12-16).  Brewer's arguments in this regard are therefore off base.

The remainder of Brewer's arguments simply do not undercut the ALJ's credibility assessment. "In sum, the ALJ closely and affirmatively linked his adverse credibility finding to substantial evidence in the record and did not employ an incorrect legal standard. 'Our precedents do not require more, and our limited scope of review precludes us from reweighing the evidence or substituting our judgment for that of the agency.'" *Zaricor-Ritchie v. Astrue*, 452 Fed. Appx. 817, 824 (10th Cir. 2011), *citing Wall*, 561 F.3d at 1070 (further quotations omitted).

**Procedural Due Process**

Social security hearings are subject to procedural due process considerations. *Yount v. Barnhart* , 416 F.3d 1233, 1235 (10th Cir. 2005); *Allison v. Heckler,* 711 F.2d 145, 147 (10th Cir.1983) (citing *Richardson v. Perales,* 402 U.S. 389, 401-02, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). Brewer's first argument is that "[t]here is clearly at least one page if not more pages missing from the report of [Dr. Fritz, the consulting examiner]." Plaintiff's Opening Brief, Dkt. 22, p. 8. The undersigned has reviewed the report of Dr. Fritz, and has not detected anything that suggests that it is not a complete report. (R. 268-69). This aspect of Brewer's due process claim is rejected.

Brewer complains that Dr. Fritz did intelligence testing and then did not provide the complete results of that testing, suggesting that the results may have supported a claim for disability under Listing 12.02, Organic Mental Disorders, or Listing 12.05, Mental Retardation. Plaintiff's Opening Brief, Dkt. #22, p. 8. To the contrary, Dr. Fritz' report directly contradicts the criteria of Listing 12.02, and she stated that Brewer's intellect was "estimated to be within the average range of functioning." (R. 269). The Court is unable to answer the question of why Dr. Fritz did not include more details of intelligence testing of Brewer, but the obvious assumption would be that she did not think it was material to the question of Brewer's disability. In any

case, the judgment of a professional to omit a particular testing result from a consulting report is not a violation of a claimant's right to due process.

Brewer's next argument is that he did not have access to Dr. Fritz' report before the hearing. Brewer's attorney at the hearing before the ALJ noted the absence of the report from the file, and he said that he "would be curious to see what that report actually says." (R. 22, 70-72). The ALJ noted that and said that he would ask for a copy of the report, and he would carefully consider it. *Id.* The report was found, because it appears in the administrative transcript before this Court, and the ALJ referred to it in his decision. Brewer argues that Dr. Fritz' report was essentially a post-hearing report that should have triggered an opportunity for a supplemental hearing. *See Yount*, 416 F.3d at 1235 (use of post-hearing medical report constitutes a denial of due process because the applicant is not given the opportunity to cross-examine the physician or to rebut the report). The court in *Yount* rejected the argument that the claimant had to show good cause for a supplemental hearing with detailed facts expected to be proven. *Id.* This ruling, however, was partially based on the letter from the Social Security Administration to the claimant, which did not require any showing of good cause in order to obtain a supplemental hearing. *Id.*

Brewer's situation differs in important ways from *Yount* and other authorities addressing post-hearing examinations. First, Dr. Fritz' examination took place before the hearing, and obviously Brewer and his attorneys were aware of this consultative examination. Second, while Dr. Fritz' report was missing from the file at the time of the hearing, the nonexamining reports of Dr. Kampschaefer and Dr. Smith were in the file. (R. 213-56). Dr. Smith's report went into some detail in summarizing Dr. Fritz' examination and report. (R. 251). Thus, unlike a post-hearing examination, here Brewer had notice of the essential contents of Dr. Fritz' report and

how the results were interpreted by the nonexamining consultants.  Third, while Brewer's attorney at the hearing noted the absence of Dr. Fritz' report and said that he would like to see it, he did not make a more explicit request that the ALJ send him a copy before making his decision, and the issue was not raised again until this appeal.

Finally, while the court in *Yount* did not require the claimant to show good cause for a supplemental hearing when the notice from the Social Security Administration had not included such a requirement, the Court finds *Yount* to be inapplicable due to the different procedural posture of Brewer's situation.  Here, Brewer has not explained how having a copy of Dr. Fritz' report before the hearing would have changed the outcome of this case.  *See Holdsworth v. Chater*, 87 F.3d 1327, at *5 (10th Cir. 1997) (unpublished) (rejecting a procedural due process argument in a Social Security disability case, because the claimant's argument "does little to inform us of the alleged errors or of any prejudice" to the claimant).  Under the unique circumstances of this case, the Court finds that, even if Brewer had received a supplemental hearing after obtaining a copy of Dr. Fritz' report, that would not have changed the outcome of Brewer's claim for disability.  The ALJ's decision is supported by substantial evidence, and there was no material violation of Brewer's right to due process.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 12th day of September, 2012.

Paul J. Cleary
United States Magistrate Judge